UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

<table>
<tr><td>————————————————————</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>RAMACHANDRAN SEETHARAMAN</td><td>)</td><td></td></tr>
<tr><td>Plaintiff,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>CIVIL ACTION NO.</td></tr>
<tr><td>STONE & WEBSTER, INC., a subsidiary</td><td>)</td><td>1:05-CV-11105 RWZ</td></tr>
<tr><td>of SHAW GROUP, INC., JOE GREEN,</td><td>)</td><td>(Consolidated With</td></tr>
<tr><td>NICK ZERVOS, DAVID EDWARDS</td><td>)</td><td>C.A. No. 1:05-CV-11863)</td></tr>
<tr><td>AND JOHN MARTIN,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Defendants.</td><td>)</td><td></td></tr>
<tr><td>————————————————————</td><td>)</td><td></td></tr>
</table>

## SEVENTH JOINT STATUS REPORT

Pursuant to the Court's order, plaintiff Ramachandran Seetharaman ("Seetharaman") and

defendants Stone & Webster, Inc., Joe Green, Nick Zervos, David Edwards and John Martin

(defendants are referred to collectively as "Stone & Webster") hereby submit this Seventh Joint

Status Report to apprise the Court of the status of Seetharaman's appeal to the Administrative

Review Board (the "ARB") of the November 30, 2005 Recommended Decision and Order of

Daniel F. Sutton, Administrative Law Judge, in the whistleblower action that Seetharaman

commenced against Stone & Webster in the Department of Labor. By the Recommended

Decision and Order, the Administrative Law Judge recommended that Seetharaman's complaint

against Stone & Webster in that whistleblower action be dismissed in its entirety.

Since the parties' Sixth Joint Status Report filed on July 17, 2007, there has been a Final

Decision and Order issued by the ARB dated August 31, 2007, a full and complete copy of

which is attached hereto ("the Final Order"). By the Final Order, the ARB has affirmed the

Recommended Decision and Order of Daniel F. Sutton, Administrative Law Judge of November 30, 2005, dismissing Seetharaman's complaint.

Essentially, Seetharaman has 60 days within which to seek review of the Final Order by filing a petition for review of the same with the First Circuit Court of Appeals, or until the end of October, 2007. See 29 CFR § 24.112(a). It is Stone & Webster's position that many, if not all, of the claims and or issues presented in this action are precluded or otherwise barred by the ARB's recent decision affirming the dismissal of Seetharaman's complaint before the Department of Labor.

Counsel for the parties have conferred and respectfully and jointly propose that the parties file a further Status Report, on or before December 17, 2007, reporting as to the status of Seetharaman's further appeal, if any, or, if no appeal is filed or pending, to set a briefing schedule with the Court with respect to the force and effect of the dismissal of his complaint before the Department of Labor upon this proceeding.

Plaintiff,                                              Defendants,

RAMACHANDRAN SEETHARAMAN,                STONE & WEBSTER, INC.,
                                                        JOE GREEN, NICK ZERVOS,
                                                        DAVID EDWARDS AND JOHN
                                                        MARTIN,

By his attorney,                                        By their attorneys,

/s/ Howard I. Wilgoren                                  /s/ Paul J. Murphy

_____      _____
Howard I. Wilgoren, BBO No. 527840         Paul J. Murphy, BBO No. 363490
6 Beacon Street, Suite 700                  Greenberg Traurig LLP
Boston, Massachusetts  02108                One International Place
(617) 523-5233                              Boston, MA 02110
                                            (617) 310-6000

Dated:  October 16, 2007

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 16th day of October, 2007, I caused to be served, electronically and by first-class mail, a copy of the preceding document upon all counsel of record.

/s/ Paul J. Murphy
Paul J. Murphy

**U.S. Department of Labor**

Administrative Review Board
200 Constitution Avenue, N.W.
Washington, D.C. 20210



In the Matter of:

RAMACHANDRAN SEETHARAMAN,                    ARB CASE NO. 06-024

          COMPLAINANT,                    ALJ CASE NO.  2003-CAA-4

    v.                    DATE:     AUG 3 1 2007

STONE & WEBSTER, INC.,

          RESPONDENT.


BEFORE:     THE ADMINISTRATIVE REVIEW BOARD


Appearances:

*For the Complainant:*
    **Ramachandran Seetharaman,** *pro se*, **Ashland, Massachusetts**

*For the Respondent:*
    **Paul J. Murphy, Esq.; Kevin P. Sweeney, Esq.,** *Menard, Murphy & Walsh*
    *LLP*, **Boston, Massachusetts**


### FINAL DECISION AND ORDER

    The Complainant, Ramachandran Seetharaman, filed a complaint with the United States Department of Labor's Occupational Safety and Health Administration alleging that his employer, the Respondent, Stone & Webster, Inc., retaliated against him in violation of the employee protection provisions of the Clean Air Act,[1] the Comprehensive Environmental Response, Compensation and Liability Act,[2] the Federal Water Pollution Control Act,[3] the Solid Waste Disposal Act,[4] the Toxic Substances Control Act,[5] (known

---

[1]    42 U.S.C.A. § 7622 (West 2003).

[2]    42 U.S.C.A. § 9610 (West 2005).

[3]    33 U.S.C.A. § 1367 (West 2001).

collectively as the environmental acts), the Energy Reorganization Act (ERA)[6] and their implementing regulations.[7] In particular Seetharaman, who was employed by Stone & Webster as a principal engineer from March 2001 until May 2002, charged that Stone & Webster violated the whistleblower provisions of the environmental acts and the ERA when it: 1) refused to allow him to attend a seminar, 2) refused to pursue business opportunities that he brought to the company's attention, thereby denying him the opportunity for advancement, 3) transferred him from the Mechanical Engineering Group to the Heat Balance Group, and 4) terminated his employment during the course of a reduction in force (RIF).[8]

OSHA investigated Seetharaman's complaint and determined that it could not substantiate his allegations of unlawful reprisal. In particular, OSHA concluded that the allegations concerning the seminar and transfer were untimely and that Stone & Webster had articulated legitimate business reasons for all of its challenged actions.[9]

Seetharaman timely requested a hearing before a Department of Labor Administrative Law Judge.[10] The ALJ presided over thirteen days of hearings, at which the parties were permitted to present evidence and legal argument. Both Seetharaman and Stone & Webster were represented by counsel. Seetharaman testified in support of his complaint; Stone & Webster called six witnesses in support of its defense.[11]

After careful consideration of the entire record and the arguments advanced by the parties, the ALJ issued a Recommended Decision and Order in which he concluded:

Seetharaman's complaint is untimely with the exception of

---

[4]    42 U.S.C.A. § 6971 (West 2003).

[5]    15 U.S.C.A. § 2622 (West 1998).

[6]    42 U.S.C.A. § 5851 (West 2003). This statute has been amended since Seetharaman filed his complaint, but the amendments are not applicable to this case because Seetharaman's complaint was filed before the amendments' effective date, August 8, 2005. Energy Policy Act of 2005, Pub. L. 109-58, Title VI, § 629, 119 Stat. 785 (Aug. 8, 2005).

[7]    29 C.F.R. Part 24 (2006). These regulations have been amended since Seetharaman filed his complaint, but the amended regulations are not implicated in this case. 72 Fed. Reg. 44,956 (Aug. 10, 2007).

[8]    *Seetharaman v. Stone & Webster, Inc.,* 2003-CAA-004, slip op. at 2 (ALJ Nov. 30, 2005)(R. D. & O.).

[9]    *Id.*

[10]    *See* 29 C.F.R. § 24.4(d)(3).

[11]    R. D. & O. at 3.

two allegations – namely, that S&W (1) refused to pursue business opportunities that he suggested and (2) terminated his employment, both allegedly in violation for his protected whistleblowing activities. The remaining allegations in the complaint are untimely and, therefore, cannot form the basis of a finding of unlawful discrimination, though they may be considered as relevant background evidence in support of the timely claims. Regarding the timely allegations, I concluded that S&W's failure to pursue business opportunities, even if true, did not constitute a prohibited adverse employment action. I further conclude that Seetharaman has not proved by a preponderance of the evidence that his protected activity contributed to his termination.[12]

The environmental laws and the ERA authorize the Secretary of Labor to receive complaints of alleged discrimination in response to protected activity and, upon finding a violation, to order abatement and other remedies.[13] The Secretary has delegated the authority to the Administrative Review Board (ARB) to review Department of Labor Administrative Law Judges' initial decisions under the environmental acts and the ERA.[14]

Under the Administrative Procedure Act, the ARB, as the Secretary's designee, acts with all the powers the Secretary would possess in rendering a decision under the whistleblower provisions. The Board engages in de novo review of the ALJ's recommended decision.[15] Accordingly, the Board is not bound by an ALJ's findings of fact and conclusions of law because the recommended decision is advisory in nature.[16]

---

[12]    *Id.* at 2.

[13]    29 C.F.R. § 24.1(a).

[14]    *See* 29 C.F.R. § 24.8. *See also* Secretary's Order 1-2002 (Delegation of Authority and Responsibility to the Administrative Review Board), 67 Fed. Reg. 64,272 (Oct. 17, 2002) (delegating to the ARB the Secretary's authority to review cases arising under, inter alia, the statutes listed at 29 C.F.R. § 24.1(a)).

[15]    *See* 5 U.S.C.A. § 557(b)(West 2000); 29 C.F.R. § 24.8; *Stone & Webster Eng'g Corp. v. Herman*, 115 F.3d 1568, 1571-1572 (11th Cir. 1997).

[16]    *See* Attorney Gen. Manual on the Administrative Procedure Act, Chap. VII, § 8 pp. 83-84 (1947) ("the agency is [not] bound by a [recommended] decision of its subordinate officer; it retains complete freedom of decision as though it had heard the evidence itself"). *See generally Starrett v. Special Counsel*, 792 F.2d 1246, 1252 (4th Cir. 1986) (under principles of administrative law, agency or board may adopt or reject ALJ's findings and conclusions); *Mattes v. United States*, 721 F.2d 1125, 1128-1130 (7th Cir. 1983) (relying on

Nevertheless, an ALJ's findings constitute a part of the record, and as such are subject to review and receipt of appropriate weight.[17]

In weighing a witness's testimony, the fact-finder considers the relationship of the witness to the parties, the witness's interest in the outcome of the proceedings, the witness's demeanor while testifying, the witness's opportunity to observe or acquire knowledge about the subject matter of the witness's testimony, and the extent to which other credible evidence supported or contradicted the testimony.[18] We accord special weight to an ALJ's credibility findings that "rest explicitly on the evaluation of the demeanor of witnesses."[19] This is so because the ALJ "sees the witnesses and hears them testify while . . . the reviewing court look[s] only at cold records."[20]

We have carefully reviewed the record, the ALJ's R. D. & O., and the parties' briefs. The R. D. & O. is comprehensive and cogently reasoned and it is in accordance with the law and the facts of this case.    Accordingly, we accept the ALJ's recommendation that we deny Seetharaman's complaint and we adopt his decision. Nevertheless we briefly discuss two arguments that Seetharaman has raised in his brief that were not directly addressed by the ALJ in his R. D. & O.

**1.    Whether the ALJ erred when he did not apply a dual motive analysis to Seetharaman's claims of retaliation.**

Seetharaman contends, "[The] ALJ committed 'serious legal error' when he did not use Mixed motive analysis in the ALJRDO and further used same legal standards under ERA and Environmental laws[.]"[21] Once a case has been tried on its merits, as here, the relevant question is whether the complainant has successfully met his or her burden of proof that the respondent discriminated.[22] Therefore to prevail on his environmental and

---

*Universal Camera Corp. v. NLRB,* 340 U.S. 474 (1951), in rejecting argument that higher level administrative official was bound by ALJ's decision).

[17]    *Universal Camera,* 340 U.S. at 492-497; *Pogue v. U.S. Dep't of Labor,* 940 F.2d 1287, 1289 (9th Cir. 1991).

[18]    *Jenkins v. United States Envtl. Pro. Agency,* ARB No. 98-146, ALJ No. 88-SWD-002, slip op. at 10 (ARB Feb. 28, 2003) (citations omitted).

[19]    *NLRB v. Cutting, Inc.,* 701 F.2d 659, 663 (7th Cir. 1983); *Poll v. R.J. Vyhnalek,* ARB No. 98-020, ALJ No. 96-ERA-030, slip op. at 8 (ARB June 28, 2002).

[20]    *Pogue,* 940 F.2d at 1289.

[21]    Appellant/Complainant's Initial Brief (I.B.) at 17 (footnote omitted).

[22]    *Kester v. Carolina Power & Light Co.,* ARB No. 02-007, ALJ No. 2000-ERA-031, slip op at 6-7 (ARB Sept. 30, 2003)(ERA); *Dierkes v. West Linn-Wilsonville School Dist.,*

ERA whistleblower complaints, Seetharaman was required to establish by a preponderance of the evidence that he engaged in protected activity, that Stone & Webster was aware of the protected activity, that he suffered adverse employment action, and that Stone & Webster took the adverse action because of his protected activity.[23] If Seetharaman had met this burden, then we would have proceeded to determine whether Stone & Webster had demonstrated by a preponderance of the evidence (whistleblower acts)[24] or clear and convincing evidence (ERA)[25] that it would have taken the same unfavorable personnel action in the absence of the protected activity.[26] Examining whether a respondent has met this burden of proof is commonly referred to as the mixed or dual motive analysis. The respondent's burden under the dual motive analysis is in the nature of an affirmative defense and arises only if the complainant has proven that the respondent took adverse action in part because of the complainant's protected activity.[27] The ALJ found, and we agree, that Seetharaman "failed to introduce any credible evidence to rebut S&W's evidence that he was included in the RIF because he was the least productive member of the HB Group."[28] Because Seetharaman failed to establish by a preponderance of the evidence that his protected activity either motivated or contributed to the adverse action, neither the ALJ, nor we have reason to engage in dual motive analysis.[29]

## 2.    Whether the Board should reconsider its Final Decision and Order in *Seetharaman v. Gen. Elec. Co.,* ARB No. 03-029, ALJ No. 2002-CAA-021 (May 28, 2004).

In *Seetharaman v. Gen. Elec. Co.,* ARB No. 03-029, ALJ No. 2002-CAA-021 (May 28, 2004)(*Seetharaman I*), the Board agreed with the ALJ that the Respondents,

---

ARB No. 02-001, ALJ No. 2000-TSC-002, slip op. at 6 (ARB June 30, 2003)(environmental acts).

[23]    In environmental act cases, the complainant must establish by a preponderance of the evidence that his or her protected activity was a motivating factor in the adverse action; in ERA cases the complainant must prove by a preponderance of the evidence that the protected activity was a contributing factor. *See Lopez v. Serbaco, Inc.,* ARB No. 04-158, ALJ No. 04-CAA-005, slip op. at 4 n.6 (ARB Nov. 29, 2006).

[24]    *Evans v. Baby-Tenda,* ARB No. 03-001, ALJ No. 2001-CAA-004, slip op. at 4 n.1 (ARB July 30, 2004).

[25]    *Kester,* slip op. at 5-6.

[26]    *Id.* at 7-8.

[27]    *Id.* at 8.

[28]    R. D. & O. at 24.

[29]    *Kester,* slip op. at 8.

General Electric Company, Pacific Gas & Electric Company, Exelon Corporation, Mitsubishi Power Systems, Massachusetts Water Resources Authority, Nebraska Boiler Company, and English Boiler and Tube, Incorporated (the 03-029 Respondents) were entitled to summary dismissal of the complaints against them because Seetharaman "raised no genuine issue of material fact regarding an essential element of his claim: an employer-employee relationship with Respondents."[30] Seetharaman, to date, has filed no motion requesting the Board to reconsider its decision. Instead, Seetharaman has urged the Board to reconsider its decision in his initial and rebuttal briefs in this case.[31] Most significantly, Seetharaman has failed to serve the 03-029 Respondents with his request that we reconsider our decision in that case.

The ARB is authorized to reconsider a decision upon the filing of a motion for reconsideration within a reasonable time of the date on which the decision was issued.[32] In considering a motion for reconsideration, the Board has applied a four-part test to determine whether the movant has demonstrated:

> (i) material differences in fact or law from the presented to a court of which the moving party could not have known through reasonable diligence, (ii) new material facts that occurred after the court's decision, (iii) a change in the law after the court's decision, and (iv) failure to consider material facts presented to the court before its decision.[[33]]

As an initial matter we note that Seetharaman has requested reconsideration more than two years after the Board issued its Final Decision and Order in *Seetharaman I*. Given the Board's recent decision in *Henrich v. Ecolab, Inc.*,[34] there is a substantial

---

[30]    Slip op. at 7.

[31]    I.B. at 4, 34; Rebuttal Brief at 2-3.

[32]    *Macktal v. Chao*, 286 F.3d 822, 826 (5th Cir. 2002), *aff'g Macktal v. Brown & Root, Inc.*, ARB Nos. 98-112/122A, ALJ No. 86-ERA-023, slip op. at 2-6 (ARB Nov. 20, 1998); *Powers v. Pinnacle Airlines, Inc.*, ARB No. 04-102, ALJ No. 2004-AIR-006, slip op. at 1 (ARB Feb. 17, 2005). *See also Henrich v. Ecolab, Inc.*, ARB No. 05-030, ALJ No. 2004-SOX-051, slip op. at 11 (ARB May 30, 2007).

[33]    *Chelladurai v. Infinite Solutions, Inc.*, ARB No. 03-072, ALJ No. 03-LCA-004, slip op. at 2 (ARB July 24, 2006); *Rockefeller v. U.S. Dep't of Energy*, ARB Nos. 03-048, 03-184; ALJ Nos. 2002-CAA-005, 2003-ERA-010, slip op. at 2 (ARB May 17, 2006); *Saban v. Morrison-Knudsen*, ARB No. 03-143, ALJ No. 03-PSI-001, slip op. at 2 (ARB May 17, 2006); *Halpern v. XL Capital, Ltd.*, ARB No 04-120, ALJ No. 2004 SOX-054, slip op. at 2 (ARB Apr. 4, 2006); *Getman v. Southwest Secs.*, ARB No. 04-059, ALJ No. 2003-SOX-008, slip op. at (ARB Mar. 7, 2006); *Knox v. Dep't of the Interior*, ARB No. 03-040, ALJ No. 2001-LCA-003, slip op. at 3 (ARB Oct. 24, 2005).

[34]    ARB No. 05-030, ALJ No. 2004-SOX-051, slip op. at 11 (ARB May 30, 2007).

question whether the request for reconsideration, even if it had been properly filed would be timely.  But even if it had been properly filed and was timely, upon consideration of the request's merits, we would nevertheless deny reconsideration.

Upon review of Seetharaman's reconsideration request, we conclude that he has failed to meet any of the provisions of the Board's four-part test for reconsideration.  As was true when Seetharaman presented his original case in *Seetharaman I*, he has presented no facts, evidence or law that addresses the relevant issue:  whether he had an employee-employer relationship with the 03-029 Respondents.  Accordingly, even if Seetharaman had filed a proper and timely request for reconsideration, he would not be entitled to such relief.

Finally, we note that Seetharaman states in his I.B., "ALJRDO, page 7 FN 9 – incorrectly lists 6-3-2002 as date of the complaint.  This is plain [sic] wrong.  On 5-24-2002, complainant met John Sechovicz of USDOL, OSHA & personally filed charge orally/via letter dated the same day.  Complainant cannot understand where ALJ got the 6-3-2002 date!"  The Secretary of Labor's initial findings issued by the Occupational Safety and Health Administration investigator state, in reference to both the alleged denial of training and transfer from the Mechanical Engineering Department to the Heat Balance Group, that the complaint was filed on "June 3, 2002, more than 180 days after the occurrence of alleged violation."[35]  Therefore, the basis for the ALJ's finding is clear.  But there does seem to be some confusion over the filing date of the complaint, given that Stone & Webster stated in its Motion to Dismiss, filed with the ALJ, that Seetharaman filed a complaint on or about May 30, 2002. [36]

In any event, Seetharaman has failed to argue the legal significance of this alleged error in his briefs to the Board and generally, the Board will not consider an issue that a party has not raised and briefed and will consider any argument thereon waived.[37]  Nevertheless, even if Seetharaman had properly preserved this objection to the ALJ's finding, the only issue to which it could potentially be relevant is the timeliness of Seetharaman's complaint regarding the transfer from the Mechanical Engineering Department to the Heat Balance Group.  However, although Seetharaman did not comply with the order to transfer to Heat Balance until on or about February 6, 2002, there is evidence in the record establishing that he had unequivocal knowledge of the transfer no later than the second week in November 2001.[38]  Thus because Seetharaman failed to file

---

[35]    Administrative Law Judge Exhibit 1, at 1, 2.

[36]    Respondent's Motion to Dismiss, or, in the Alternative, for Summary Decision at 1.

[37]    *Higgins v. Glen Raven Mills, Inc.*, ARB No. 05-143, ALJ No. 2005-SDW-007, slip op. at 8 (ARB Sept. 29, 2006).

[38]    Hearing transcript at 305-307 (Seetharaman).  *See Lewis v. U.S. EPA*, ARB No. 04-117, ALJ Nos., 2003-CAA-005, 006, slip op. at 8 (ARB Mar. 30, 2007); *Swenk v. Exelon Generating Co.,* ARB No. 04-028, ALJ No. 2003-ERA-030, slip op. at 4 (ARB Apr. 28, 2005).

his complaint within 180 days of the alleged adverse action both his environmental act[39] and ERA complaints[40] based on the transfer were untimely.  Therefore any error in the ALJ's finding that the complaint was file on June 3, 2002, was harmless.

## CONCLUSION

The ALJ's Decision and Order is **AFFIRMED**.  Finding no reason to depart from the ALJ's cogent opinion, we adopt and attach it.[41]


**DAVID G. DYE**
**Administrative Appeals Judge**


**M. CYNTHIA DOUGLASS**
**Chief Administrative Appeals Judge**

---

[39]    29 C.F.R. § 24.3(b).

[40]    29 C.F.R. § 24.3(b)(2).

[41]    *See, e.g., Kelley v. Heartland Express, Inc.,* ARB No. 00-049, ALJ No. 99-STA-29, slip op. at 3 (ARB Oct. 28, 2002).  *See also Ondine Shipping Corp. v. Cataldo,* 24 F.3d 353, 355 (1st Cir. 1994)("When a trial court produces a lucid, well-reasoned opinion that reaches an appropriate result, we do not believe that a reviewing court should write at length merely to put matters in its own words.").

# ADMINISTRATIVE REVIEW BOARD
## CERTIFICATE OF SERVICE

**CASE NAME**    :    *Ramachandran Seetharaman v. Stone & Webster, Inc.*

**ARB CASE NO. :**    **06-024**

**ALJ CASE NO. :**    **2003-CAA-4**

**DOCUMENT**    :    **FINAL DECISION AND ORDER**

A copy of the above-referenced document was sent to the following persons on

_____AUG 3 1 2007_____.

*L. Wilson*

## CERTIFIED MAIL:

Ramachandran Seetharaman
10 Pondview Drive
Ashland, MA  01721

Walter Rhodes
Stone & Webster, Inc.
A Shaw Group Company
100 Technology Ctr. Drive
Stoughton, MA  02072-4705

Paul J. Murphy, Esq.
Greenberg, Trurig, LLP
One International Place
20th Floor
Boston, MA  02110

Martin H. Green, Esq.
Law Offices of Martin H. Green, P.C.
860 Worcester Road
Suite 200
Framingham, MA  01702-5260

2.

**INTEROFFICE OR REGULAR MAIL:**

Steven J. Mandel, Esq.
Associate Solicitor
U.S. Department of Labor/SOL
200 Constitution Avenue, NW
Room N-2716, FPB
Washington, DC  20210

Jonathan Snare, Esq.
Office of the Solicitor
U.S. Department of Labor
200 Constitution Ave., NW
Room S-2002
Washington, DC  20210

Directorate of Enforcement Programs
U.S. Department of Labor/OSHA
200 Constitution Avenue, NW
Room N-3468, FPB
Washington, DC  20210

Regional Administrator
U.S. Department of Labor/OSHA
1441 Main Street
Room 550
Springfield, MA  01103

Hon. John M. Vittone
Chief Administrative Law Judge
Office of Administrative Law Judges
800 K Street, NW, Suite 400
Washington, DC  20001-8002

Hon. Daniel F. Sutton
Administrative Law Judge
Office of Administrative Law Judges
O'Neill Federal Building – Room 411
10 Causeway Street
Boston, MA  02222

**U.S. Department of Labor**

Office of Administrative Law Judges
O'Neill Federal Building - Room 411
10 Causeway Street
Boston, MA 02222

(617) 223-9355
(617) 223-4254 (FAX)

**Issue Date: 30 November 2005**

CASE NO.:    2003-CAA-00004

In the Matter of

**RAMACHANDRAN SEETHARAMAN**

Complainant

v.

**STONE & WEBSTER, INC.**

Respondent

Appearances:

Martin H. Green, Framingham, Massachusetts,
for the Complainant

Paul J. Murphy and Kevin P. Sweeney (Menard, Murphy
& Walsh, LLP), Boston, Massachusetts, for the Respondent

Before:    Daniel F. Sutton
           Administrative Law Judge

## RECOMMENDED DECISION AND ORDER

### I. Introduction

This case arises under the employee protection provisions of the Clean Air Act (CAA),
42 U.S.C. § 7622, the Comprehensive Environmental Recovery, Compensation and Liability Act
(CERCLA), 42 U.S.C. § 9610, the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. §
1367, the Solid Waste Disposal Act (SWDA), 42 U.S.C. § 6971, the Toxic Substance Control
Act (TSCA), 15 U.S.C. § 2622, the Energy Reorganization Act of 1974 (ERA), 42 U.S.C. §

5851, and the implementing regulations found at 29 C.F.R. Part 24.[1]  The Complainant, Ramachandran Seetharaman (Seetharaman or Complainant) alleges that his former employer, Stone & Webster, Inc. (S&W) violated the employee protection provisions by terminating his employment in May of 2002 and engaging in other acts of employment discrimination in retaliation for his statutorily protected "whistleblowing" activities.  The matter is before the undersigned Administrative Law Judge pursuant to Seetharaman's request for a hearing.  29 C.F.R. § 24.4(d).

After careful consideration of the entire record, including the arguments advanced by the parties, I find that Seetharaman's complaint is untimely with the exception of two allegations – namely, that S&W (1) refused to pursue business opportunities that he suggested and (2) terminated his employment, both allegedly in violation for his protected whistleblowing activities.  The remaining allegations in the complaint are untimely and, therefore, cannot form the basis of a finding of unlawful discrimination, though they may be considered as relevant background evidence in support of the timely claims.  Regarding the timely allegations, I conclude that S&W's failure to pursue business opportunities, even if true, did not constitute a prohibited adverse employment action.  I further conclude that Seetharaman has not proved by a preponderance of the evidence that his protected activity contributed to his termination.  For these reasons, I conclude that his complaint must be dismissed.  My findings of fact and conclusions of law are set forth below.

## II. Procedural History

On June 3, 2002 Seetharaman filed a complaint with the U.S. Department of Labor's Occupational Safety and Health Administration (OSHA) alleging that Stone & Webster violated the employee protection provisions of the Environmental Acts and the ERA by (1) refusing to allow him to attend a seminar on May 18, 2001, (2) refusing to pursue business opportunities that he brought to the company's attention, thereby denying him opportunities for advancement, (3) transferring him from the Mechanical Engineering Group to the Heat Balance Group on February 6, 2002, and (4) terminating his employment on May 17, 2002.  ALJX 1.[2]  By letter dated October 8, 2002, OSHA notified Seetharaman that it determined that his allegations of unlawful reprisal could not be substantiated.  *Id.*  Specifically, OSHA determined that the allegations concerning the May 18, 2001 seminar and the February 6, 2002 transfer were untimely and that S&W had articulated legitimate business reasons for all of its challenged actions.  *Id.*  Seetharaman timely appealed OSHA's determination, and the matter was referred to the Office of Administrative Law Judges (OALJ) for a formal hearing.  By notice issued on October 21, 2002, a hearing was scheduled to convene on November 18, 2002 in Boston, Massachusetts, pursuant to the expedited hearing requirements set forth in 29 C.F.R. § 24.6.[3]

---

[1] The following Acts will be collectively referred to as "The Environmental Acts": (1) the Clean Air Act; (2) the Comprehensive Environmental Recovery, Compensation and Liability Act; (3) the Federal Water Pollution Control Act; (4) the Solid Waste Disposal Act; and (5) the Toxic Substance Control Act.

[2] The documentary evidence of record will be referred to as "ALJX" for jurisdictional and procedural documents admitted by the administrative law judge; "CX" for documents offered by Seetharaman; and "RX" for documents offered by S&W.  Citations to the hearing transcript are designated "TR."

[3] Seetharaman also filed related complaints against the following respondents, alleging that they acted in concert with S&W to violate his rights under the ERA and Environmental Acts: General Electric Company; Pacific Gas and

On November 4, 2002, S&W moved to dismiss Seetharaman's complaint or, in the alternative, for summary decision. In light of S&W's motion, I postponed the hearing and granted Seetharaman, who was at that point unrepresented by counsel, thirty days in which to answer S&W's motion.[4]  On February 26, 2003, I issued an order denying S&W's motion to dismiss based on a finding that Seetharaman had shown genuine issues of fact regarding the following questions: (1) whether he engaged in protected activity; (2) whether he was subject to adverse employment actions; and (3) whether there was a causal connection between his protected activity and the adverse actions. ALJX 11.  The order also notified the parties that the formal hearing would convene on June 23, 2003 in Boston, Massachusetts.  Subsequently, the hearing was further continued on joint motion of the parties. ALJX 12, 13, 15 and 17.

The hearing finally convened in Boston, Massachusetts on December 4, 2003 and was continued over the course of twelve additional days: January 20-23, 2004; June 7-9, 2004; September 8-10, 2004; November 8, 2004; and November 30, 2004.  During the hearing, the parties were afforded an opportunity to present evidence and argument.  Seetharaman appeared represented by counsel, and an appearance was made by counsel on behalf of S&W.  Seetharaman testified on his own behalf.  S&W called six witnesses: (1) Charles Cronan (Cronan), S&W's Director of Engineering; (2) David R. Edwards (Edwards), Lead Mechanical Engineer with S&W; (3) Nick George Zervos (Zervos), Supervisor of S&W's Thermal Engineering or Heat Balance Group; (4) Richard William Card (Card), employed by S&W as an Engineering Specialist; (5) Joseph Green (Green), S &W's Chief Mechanical Engineer; and (6) Dirk J. Wild (Wild), Chief Accounting Officer with the Shaw Group, S&G's parent company.  In addition to testimony, documentary evidence was admitted at the formal hearing.[5]  At the close of Seetharaman's evidence, S&W moved for a decision in its favor. ALJX 21.  I denied S&W's motion for a decision in its favor, finding that a reasonable fact finder could, on the basis of the record developed at that point, find in Seetharaman's favor with respect to his allegation that his termination was motivated by considerations of his protected activity.[6]  TR 1125-26.  Consequently, S&W was required to come forward with evidence supporting its contention that its decision to terminate Seetharaman's employment was motivated by legitimate business considerations that were unrelated to any alleged protected activity.  *Id.*

---

Electric Company; Exelon Corporation; Mitsubishi Power Systems; Massachusetts Water Resources Authority; Nebraska Boiler Company; and English Boiler and Tube, Inc.  Motions for summary decision were granted, dismissing Seetharaman's complaints against these Respondents after Seetharaman was given an opportunity to show cause why summary decision was not warranted.  *See Seetharaman v. General Electric Co. et al.*, 2004 WL 1261217 (DOL Adm. Rev. Bd. May 28, 2004).

[4] At Seetharaman's request, this deadline was twice extended.  Seetharaman timely filed his answer within the extended time frame.

[5] The following documentary evidence was admitted at the hearing: ALJX 1-33; CX 1, 4, 12-19, 22, 24-27, 37-38, 41-45, 48, 50, 52-54, 56-57, 59, 61, 64-67, 72-76, 78, 81-85, 88-101, 103-116, 118-122, 124-136, 139-145, 147-149, 155, 160-161, 168, 191, 199, 201, 207, 209, 218, 222-224, 226, 229, 233, 250, 255-256, 258-270, 273, 275-76, 279-287; and RX 1-10, 12-22.  Two of S&W's exhibits (RX 6 and 15) are covered by a confidentiality agreement between the parties (ALJX 27) and will only be discussed herein as permitted by the parties' agreement.

[6] The standard for judgment as a matter of law in discrimination cases is whether a reasonable fact finder could, on the evidence presented, find in favor of the complainant, resolving all doubts and credibility issues in the complainant's favor.  *See Mills v. Brown Univ.*, 184 F.3d 20, 29 (1st Cir. 1999); *Greenberg v. Union Camp Corp.*, 48 F.3d 22, 26 (1st Cir. 1995).

At the close of the hearing, the record was held open, at the parties' request, for the submission of post-hearing briefs. The parties subsequently agreed on deadlines for post-trial and rebuttal briefs of March 21, 2005 and April 20, 2005, respectively. After Seetharaman and S&W timely submitted post-hearing briefs, the record was closed.[7]

### III. Issues Presented

Seetharaman has not pursued his allegation regarding S&W's refusal to allow him to attend a seminar on May 18, 2001. *See* ALJX 18 (Complainant's Pre-Hearing Report) and ALJX 32. He has not, however, formally moved to amend his complaint to delete this allegation pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, governing withdrawal of counts within multiple count complaints. *See Frady v. Tennessee Valley Authority*, USDOL/OALJ Reporter (HTML), ALJ No. 92-ERA-19 (Sec'y Oct. 23, 1995), slip op. at 2-3. Accordingly, the issues presented for adjudication are: (1) whether the complaint is timely with respect to Seetharaman's allegations concerning S&W's decisions to (a) not allow him to attend the seminar on May 18, 2001, (b) transfer him to the Heat Balance Group and (c) not pursue his suggestions regarding new business opportunities; (2) whether Seetharaman has proven by a preponderance of the evidence that S&W intentionally discriminated against him; and (3) if discrimination is shown, whether S&W has shown by clear and convincing evidence that it would have terminated Seetharaman regardless of his protected activity.

### IV. Findings of Fact and Conclusions of Law

#### A. Background and Employment History

Seetharaman was born in Canjur, Tamaloti, India. After high school, he was admitted to the India Institute of Technology (ITT) in Madras, India in 1974.[8] TR 14. He graduated from ITT in 1979 with a Bachelor's Degree in Technology and Mechanical Engineering after achieving the rank of "first class" which he described as the highest class rank awarded by the Institute. TR 15. Next, Seetharaman attended the University of Illinois in Chicago and graduated in 1980 with a Master's Degree in Energy Engineering, a subspecialty in Mechanical Engineering and a grade point average of 4.92. TR 16-17. Prior to working for S&W, Seetharaman held several engineering positions with nuclear, gas, aerospace, environmental and power companies. TR 17-22. From March 2000 to March 2001, he worked primarily for himself, attempting to develop power plants in India. TR 23, 691.

On or around March 19, 2001, S&W hired Seetharaman and assigned him to its Mechanical Engineering Department in Stoughton, Massachusetts as a Principal Engineer. ALJX 16; TR 23; ALJX 32 at 2; ALJX 18 at 2. Seetharaman remained in this position

---

[7] By motion submitted March 25, 2005, counsel for Seetharaman requested leave to file a corrected post-hearing brief, explaining that his original brief cited to the electronic version of the transcript and he later discovered a discrepancy between the pagination of the electronic and printed transcripts. The undersigned granted this motion and accepts the corrected version of Seetharaman's Post-Hearing Brief. The parties' post-hearing briefs are admitted as part of the record and will be referred to as ALJX 32 (Seetharaman's Post-Hearing Brief); ALJX 33 (S&W's Post-Hearing Brief); ALJX 34 (Seetharaman's Post-Hearing Rebuttal Brief); and ALJX 35 (S&W's Memorandum in Reply to Seetharaman's Post-Hearing Brief).

[8] Prospective ITT students must take a competitive entry examination; Seetharaman received a score high enough to qualify him for admission. TR 14, 15.

throughout his employment with S&W, performing engineering assignments on both fossil fuel and nuclear power plants. ALJX 32 at 2; ALJX 33 at 5; TR 23-60.

Seetharaman's first assignment at S&W was to assess the strengths and weaknesses of a proposed nuclear reactor. TR 31. Seetharaman testified that on or about March 21, 2001, he informed Green, his supervisor on this assignment, of the dangerous consequences of using ammonia in a nuclear reactor loop. ALJX 32 at 5. Seetharaman stated that he warned Green that if a relief valve in such a reactor system was to blow, "it would be a safety situation and if there was a nuclear accident like a loss of coolant accident and there was a radiated release, it would create much more of a dire situation." ALJX 32 at 5; TR 31-32, 48. Green testified that he did not recall any occasion on which Seetharaman raised concerns, either generally that S&W was engaging in improper or unlawful activity or specifically regarding a release of ammonia. TR 2374-76. Seetharaman's second assignment was on the Phalai coal-fired power plant, located in Vietnam. TR 49.

Seetharaman's next assignment at S&W was the Covert-Badger-Goose Lake fossil fuel power generation project (the "Covert Project"). *Id*; TR 1170. Seetharaman was assigned to work on the evaporative cooling system and auxiliary boiler ("aux boiler") on the Covert Project. ALJX 32. He testified that while on this project, he repeatedly raised safety concerns with S&W regarding its plan to use "raw lake water" and formaldehyde emissions. TR 59-64, 71-72. Seetharaman stated that he specifically recommended in a memorandum sent to Edwards' attention on April 10, 2001 that only de-mineralized water be used in order to maximize public and environmental safety and because it was the "Best Available Control Technology" (BACT) for limiting emissions. TR 68, CX 1. In addition, Seetharaman explained that he repeatedly proposed that S&W use a Selective Catalytic Reduction (SCR) module on the Covert Project since it was the BACT for treating toxic gas formaldehyde. TR 125-134. Witnesses for S&W testified that although Seetharaman suggested the use of demineralized water, he did not advise them that such water was necessary for safety or environmental purposes. ALJX 33; TR 1408. Further, S&W's witnesses testified that S&W did not ignore the formaldehyde emissions limits, and they denied that Seetharaman expressed any concerns to the contrary. ALJX 33; TR 1413-14, 1466.

In or around November, 2001, Seetharaman received a copy of his first job performance evaluation. TR 297. Seetharaman received a rating of four out of a possible five on all but two of the performance areas rated in his job evaluation. CX 65. He received a rating of 3 out of 5 on the remaining two performance areas. *Id.* Also in or around November, 2001, Seetharaman learned that S&W was considering transferring him from the Covert Project to the Heat Balance Group ("HB Group"). TR 297. After a series of delays initiated by Seetharaman for the purpose of completing work on the Covert Project, Joseph Green, S&W's Chief Mechanical Engineer, informed Seetharaman by e-mail dated January 9, 2002 that "You need to working in the Heat Balance Group – NOW." CX 108 (emphasis in original).

Seetharaman finally relocated to the work area of the HB Group on or about February 6, 2002 and was assigned to work on pipe size calculations for a nuclear power plant in Lungmen, China (the "Lungmen Project"). He testified that while in the HB Group, he informed S&W personnel, including his supervisor, Nick Zervos, that the formula used by S&W to calculate the sizes of emergency drain pipes proposed for the Lungmen nuclear power plant resulted in inadequate and unsafe pipe diameters. TR 581, 861; CX 266. Seetharaman testified that he believed that the pipes needed to be larger than those S&W planned on using. He stated that

S&W relied on TPCRFL, a computer program for pipe-sizing, even though that program has a known defect. ALJX 32 at 19; TR 1695, 2034. He further stated that when he reported his concerns to another HB Group engineer, William Card, Card responded by instructing him to "finagle" the results. CX 134. As an alternative to the TPCRFL program, Seetharaman suggested to Zervos that the HB Group use a different formula, the G.S. Liao method, for safer and more accurate pipe-sizing. TR 419; ALJX 32 at 7. Seetharaman testified that when he told Zervos that he was not comfortable with the size of the proposed pipes because they were "an accident waiting to happen," Zervos responded by telling him that "we cut out people who don't follow our ways." TR 581-82.

Zervos denies making any such statement. TR 2012. Zervos further testified that when Seetharaman suggested the using the G.S. Liao method, he encouraged Seetharaman to forward a copy of G.S. Liao's paper to his attention. TR 1669. However, he said that after reviewing the paper, he concluded the G.S. Liao's method, which admittedly produced conservative calculations, was not the most efficient and precise method for sizing the pipes to be used in the Lungmen plant. TR 1670.

In addition, Card testified that, contrary to Settharaman's allegations regarding the TPCRFL program, TPCRFL has passed the necessary quality assurance tests for utilization for safety-related systems in nuclear plants. TR 2039, RX 10. Zervos and Card also testified that the "defect" in the TPCRFL program is easily and commonly worked around by adjusting or "finagling" some of the results, and they characterized their use of the term "finagle" as an innocent reference to an accepted alternate formula, rather than any intention to falsify data or compromise nuclear safety. TR 1694, 1775, 1778, 1780-81, 2241. Card also explained that since Seetharaman was unfamiliar with the TCPRFL program and its nuances, Seetharaman had to "finagle" the calculations by utilizing the TPCRFL results in conjunction with another computer program (PRDROP-2) to obtain appropriate calculations. TR 2108-09.

Finally, Seetharaman testified that during April, 2002, he raised quality and safety concerns about S&W's potential use of a software program called ARROW for nuclear work. TR 620, ALJX 32 at 7. S&W terminated Seetharaman's employment effective May 17, 2002. TR 23; ALJX 18 at 2; ALJX 33 at 34.

B. Timeliness

Any complaint of discrimination in violation of the employee protection provisions of the Environmental Acts must be filed within thirty days of the alleged violation. 29 C.F.R. § 24.3(b)(1). Complaints under the ERA must be filed within 180 days after the alleged violation. 42 U.S.C. § 5851(b)(1); 29 C.F.R. § 24.3(b)(2). The filing limitation periods run from the date when a complainant "received 'final, definitive, and unequivocal notice' of an adverse employment decision." *Swenk v. Excelon Generation Co.*, 2005 WL 1028215*3, ARB No. 04-028, ALJ No. 2003-ERA-30, slip op. at 4 (ARB Apr. 28, 2005) (citations omitted). Thus, the critical date for starting a limitation period is when the complainant knew or should have known of the adverse employment decision, rather than the date when the decision became effective or when the complainant actually felt the adverse effects of the decision. *Id. See also Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) (proper focus contemplates the time the employee receives

notification of the discriminatory act, not the point at which the consequences of the act become painful); *Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980) (limitations period began to run when the employee was denied tenure rather than on the date his employment was terminated). Since Seetharaman filed his complaint with OSHA on June 3, 2002, the only adverse employment actions falling within the 30-day limitation periods of the Environmental Acts are those decisions for which Seetharaman received final, definitive and unequivocal notice on or after May 4, 2002, unless grounds exist for tolling or extending the limitation period. Under the ERA, only those decisions for which Seetharaman received final, definitive and unequivocal notice on or after December 5, 2001 could be the subject of a timely complaint. S&W argues that all of the claimed acts of reprisal, except for the termination, are time-barred under the Environmental Acts and the ERA and, therefore, must be dismissed. ALJX 33 at 40.[9] Seetharaman does not dispute that many the alleged adverse employment actions alleged in his complaint fall outside the applicable limitations periods, but he asserts that they should be considered timely as they fall within a pattern of behavior constituting a hostile work environment. I will first address whether the allegations in Seetharaman's complaint come within applicable limitation periods. If they do not, I will then consider Seetharaman's hostile work environment contentions.

## 1. Refusal to Allow Attendance at the May 18, 2001 Seminar

As discussed above, Seetharaman did not pursue this allegation in the lengthy formal hearing proceedings on his complaint. He has made no argument to show why he did not have final, definitive and equivocal notice of S&W's allegedly adverse decision by not later than May 18, 2001 when the seminar took place in his absence. Accordingly, I find that his June 3, 2002 complaint is untimely under both the ERA and Environmental Acts with respect to this action as it was filed more than 180 days thereafter.

## 2. Failure to Pursue Proposed Business Opportunities

Seetharaman argues that on several occasions in late 2001 and early 2002, he informed S&W of several million dollars in potential new business opportunities. ALJX 10; ALJX 18 at 4; ALJX 32 at 38; TR 23, 690-96. Seetharaman claims that S&W's refusal to pursue these opportunities denied him opportunities for advancement. ALJX 10; ALJX 1. Seetharaman testified that just prior to coming to S&W he spent a year doing power plant business development in India and that upon being hired by S&W in March, 2001, he told management, including Green, about his business development contacts. TR 23, 690. Seetharaman testified that Green entertained these proposals and encouraged him to contact S&W's head of Marketing, Tom Brady (Brady), about them. TR 693. Specifically, Seetharaman pointed to an e-mail he sent to Brady and Green on November 30, 2001 in which he informed them of a potential power

---

[9] It is noted that although Seetharaman's June 3, 2002 complaint is clearly timely under the ERA's 180-day limitation period with respect to S&W's decision to terminate his employment, it could be considered untimely under the 30-day limitation periods of the Environmental Acts because he received final, definitive and unequivocal notice of the layoff decision on May 3, 2002, 31 days prior to the filing date. However, the limitations periods are not jurisdictional and must be affirmatively raised by a respondent. *Hobby v. Georgia Power Co.*, USDOL/OALJ Reporter (HTML), ALJ No. 90-ERA-30 at 4 (Sec'y Aug. 4, 1995); *aff'd. sub nom Georgia Power Co. v. USDOL*, No. 01-10916 (11th Cir. Sept. 30, 2002) (unpublished). Since S&W has not raised a timeliness issue with respect to its termination decision, the defense has been waived.

- 7 -

project for S&W to pursue in Asia. TR 1023, CX 226. In this e-mail, Seetharaman wrote that
S&W's proposal to pursue the project had to be submitted by January 3, 2002. *Id.* In addition,
Seetharaman testified that he sent an e-mail to Brady and Green on November 16, 2001
discussing a pipeline job in Thailand that a contact of his brought to his attention. TR 1026, CX
224. He also stated that he forwarded this e-mail to Edward Humphries of S&W who does
pipeline work. *Id.* Since S&W's alleged failure to pursue these business opportunities and,
specifically, the Asian power project for which a proposal was due by January 3, 2002, occurred
within 180 days of June 3, 2002, I conclude that this allegation is timely under the ERA but not
under the 30-day limitation periods of the Environmental Acts.

### 3. Transfer to the Heat Balance Group

The record shows that Green told Seetharaman during November, 2001 that he would be
transferred from the Covert Project, which was under the auspices of the Mechanical
Engineering Department, to the HB Group. Although Seetharaman did not actually relocate to
the office space occupied by the HB Group until February 6, 2002, I find that he had final,
definitive and unequivocal notice of the transfer by no later than January 9, 2002 when Green
instructed him by e-mail, "Ram [Seetharaman's nick-name] You need to be working in the Heat
Balance Group – NOW." CX 108 (emphasis in original). Consequently, his June 3, 2002
complaint is untimely under the Environmental Acts. His complaint does comply with the
ERA's longer 180-day limitation period with respect to this allegation, but I find that that it is the
Environmental Acts, not the ERA, which are applicable because Seetharaman's whistleblowing
activities which allegedly motivated S&W's decision to transfer him to the HB Group concerned
particulate emissions and water pollution issues at a fossil fuel power plant. That is, the legal
standard for obtaining protection under the ERA requires, *inter alia,* that a whistleblower's
objection be based on a reasonable belief that "compliance with applicable nuclear safety
standards" is jeopardized. *Williams v. Mason & Hanger Corp.,* 2002 WL 31662916*14-15,
ARB No. 98-030, ALJ No. 1997-ERA-14, slip op at 16 (ARB Nov. 13, 2002). Since
Seetharaman has made no claim that the concerns that he raised while working on the fossil fuel
Covert Project in any way implicated nuclear safety, I find that he cannot invoke the ERA's 180-
day limitation period with respect to his allegation that S&W discriminatorily transferred him to
the HB group in retaliation for his protected activities while working on the Covert Project.[10]

---

[10] Seetharaman did testify that he raised a safety concern to Green during March of 2001 about the use of ammonia
water in a nuclear power plant. TR 26, 32. However, even assuming without finding that this conversation qualifies
as protected activity under the ERA, I find that a single, isolated utterance, which is unaccompanied by any evidence
of a hostile reaction, is too remote in time from the alleged discriminatory transfer to the Heat Balance Group to be
considered a motivating factor. *See Bonanno v. Stone & Webster Engineering Corp.,* 95-ERA-54 and 96-ERA-7,
slip op. at 2 (ARB Dec. 12, 1996) (passage of three years, with no evidence animus toward the protected activity,
established the absence of any connection between the protected activity and adverse action). Although an eight
month interval between protected activity and an adverse action may provide sufficient temporal proximity to raise
an inference of discrimination in an appropriate case; *Seda v. Wheat Ridge Sanitation District,* 91-WPC-1, slip op. at
2 n.2 (Sec'y Sept. 13, 1994); temporal proximity is just one piece of evidence to be weighed in deciding the ultimate
question of whether a complainant has proved by a preponderance of the evidence that retaliation was a motivating
factor in the adverse action. *Thompson v. Houston Lighting & Power Co.,* ARB No. 98-101, ALJ No. 1996-ERA-
34, slip op. at 6 (ARB Mar. 30, 2001). *See also Bartlik v. U.S. Dep't of Labor,* 73 F.3d 100, 103 n.7 (6th Cir. 1996)
(temporal proximity by itself is insufficient to establish prima facie case). On the facts of this case, I conclude that it
is implausible that Seetharaman's comments to Green about ammonia water in March played any role in Green's

### 4. Hostile Work Environment

Seetharaman argues against rejection of his pre-termination allegations, claiming that the filing deadline was enlarged because a hostile work environment created a continuing violation. ALJX 32 at 12. He asserts that beginning in March of 2001 when he voiced his first environmental concerns to Green, there was a "pervasive and ever-present discriminatory animus on the part of S&W's managerial personnel toward Seetharaman because of Seetharaman 's repeated warnings about public health and safety issues or environmental impacts of S&W's practices." ALJX 32 at 13. S&W avers that the evidence does not support a finding of a hostile work environment and thus that the ordinary statutes of limitations apply to Seetharaman's claims.

Under the hostile work environment doctrine, if all of the alleged adverse employment actions are part of the same unlawful employment practice and at least one of the acts comes within the statutory filing period, the earlier claims are not time-barred. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 116-117 (2002) (*Morgan*). That is, if Seetharaman can prove that a hostile work environment existed at S&W within thirty days prior to June 3, 2002 when he filed his complaint with OSHA, his complaint can reach otherwise untimely adverse employment actions that are found to part of a pattern of conduct constituting a hostile work environment.

A hostile work environment involves repeated conduct that, cumulatively, comprises an unlawful employment practice. *Morgan*, 536 U.S. at 115. To establish a hostile work environment, Seetharaman must prove, by a preponderance of the evidence, that (1) he engaged in protected activity; (2) he suffered intentional harassment related to that activity; (3) the harassment was particularly severe or pervasive so as to alter the conditions of employment and create an abusive working environment; and (4) the harassment would have detrimentally affected a reasonable person and did detrimentally affect Seetharaman. *See, e.g., Sasse v. Office of U.S. Attorney, U.S.D.O.J.*, 2004 WL 230771*28, ARB Nos. 02-077, 02-078, 03-044, ALJ Case No. 98-CAA-7, slip op. at 35 (ARB Jan. 30, 2004), *aff'd sub nom Sasse v. U.S. Dep't. of Labor*, 409 F.3d 773 (6th Cir. 2005); *Williams v. Mason & Hanger Corp.*, 2002 WL 31662916*9, ARB No. 98-030, ALJ Nos. 97-ERA-14, slip. op. at 13; (ARB Nov. 13, 2002). More specifically, a successful hostile work environment claim requires proof that S&W's conduct was extremely serious and pervasive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (discourtesy, rudeness, and the ordinary workplace commentary, *i.e.*, sporadic use of abusive language, joking about protected status or activity, and occasional teasing not to be confused with harassment). Factors to be considered in order to determine the existence of a hostile work environment include "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Berkman v. U.S.*

---

decision eight months later to transfer him to the HB group. *See Young v. Philadelphia Electric Company*, 87-ERA-11, slip op. at 5 (Sec'y Dec. 18, 1992).

*Coast Guard Acad.*, ARB No. 98-056, ALJ Case Nos. 97-CAA-2, 97-CAA-9, slip op. at 16 (ARB Febuary 9, 2000).

Finally, a successful hostile work environment claim requires proof that the alleged acts comprise part of the same hostile work environment practice. *Morgan*, 536 U.S. at 118.

In support of his hostile work environment claim, Seetharaman testified that his supervisors, Nick Zervos and Joseph Green were hostile towards him during most of 2001 and in the early part of 2002. TR 348, 581-83. Seetharaman testified that in April, 2001, after he suggested that S&W use demineralized water for gas turbine inlet air cooling because it is a safer, more environmentally sound alternative than using "raw" lake water, he sensed a change in his managers' attitude toward him. TR 106, 112. Seetharaman stated that after he made this suggestion, his managers became "acrid" towards him and no longer liked him. TR 112. Seetharaman testified more specifically that he was humiliated when on or around May 20, 2001, Joe Creamer, an assistant project manager, called him an "idiot" in the hallway because of his suggestion regarding demineralized water. TR 107. Seetharaman stated that Creamer made this comment in the presence of Seetharaman's co-workers and Jack Martin, Creamer's supervisor who giggled in response. TR 108, 112. Seetharaman also claims that S&W Management asked Don Yonika, a co-worker of Seetharaman's in the HB Group, to perform "surveillance" on Seetharaman. ALJX 32 at 45. Edwards agreed that he had asked Yonika to observe Seetharaman's work habits and productivity. TR 1454. Seetharaman testified that upon his transfer to the HB Group, he was put in a work station that was physically segregated from the other members of the group. TR 313, ALJX 32 at 47, CX 266.

Seetharaman further testified that in November, 2001, Green was hostile when they spoke about S&W's plan to transfer Seetharaman to the HB Group. TR 305-6. During this conversation, Seetharaman questioned the proposed transfer since he was busy with the Covert Project and testified that Green angrily responded, "Oh, really?" *Id.* According to Seetharaman, "That was the first time I faced a severe amount of hostility from somebody in management ... when Joe Green did that during our meeting, I knew something was wrong." *Id.* He also said that virtually every day around this time, Green sent him e-mails or met with him, "pestering" and "goading" him to transfer to the HB Group. TR 348-49. Seetharaman testified that on the day before his planned vacation to India from December 19, 2001 through January 4, 2002, he received a loud and angry voicemail message from Green who told him to skip his vacation in order to transfer to the HB Group. TR 472-744. Finally, Seetharaman testified that on or about April 3, 2002, Zervos rejected his suggestions regarding the methodology for determining pipe sizes for the Lungmen plant and threatened him by asking, "How long have you been around these parts?" and warning, "You know we cut out people who don't follow our ways." TR 581-83. Seetharaman testified that he understood this statement as a threat as well as an indication that S&W was not going to follow his suggestions about pipe-sizing calculations. TR 582.

Seetharaman's evidence that S&W created a hostile work environment consists of four specific statements over the course of more than one year, his non-specific, subjective belief that various S&W managers became "acrid" toward him and engaged in harassment and pestering, and his belief that he was placed under surveillance by Yonika and deliberately put in an isolated work area after he transferred to the HB Group. Even giving full credit to Seetharaman's

testimony, I find that the complained-of conduct was not so severe or pervasive that it altered Seetharaman's conditions of employment and amounted to the type of harassment that would have detrimentally affected a reasonable person or unreasonably interfered with Seetharaman's work performance. In my view, the offensive and hostile statements described by Seetharaman fall well short of establishing that his employment with S&W was "permeated with 'discriminatory intimidation, ridicule and insult,' that was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal quotation marks in original). Since Seetharaman has not established that he was exposed to a hostile work environment, his hostile work environment claim is rejected, and the limitations periods are not extended. Accordingly, Seetharaman's termination and S&W's failure to pursue business opportunities are the only tangible adverse employment actions that are both timely and actionable under the Environmental Acts and the ERA. While the other pre-termination allegations of unlawful retaliation are untimely, they may be considered in conjunction with the timely allegations as relevant background evidence. *Morgan*, 536 U.S. at 113 (in Title VII claim, employee can use prior, though untimely, acts as background evidence in support of a timely claim).

      C. Failure to Pursue Seetharaman's Business Proposals

      Seetharaman alleges that because he engaged in protected whistleblowing activity, S&W discriminatorily refused to pursue business opportunities that he brought to the company's attention. In response to this claim, S&W's witnesses asserted that Seetharaman's position as a Principal Engineer did not involve business development. TR 1289. Edwards testified that Seetharaman was never assigned to do business development. TR 1358. Edwards further testified that any business development proposals presented by a Principal Engineer would be forwarded to the S&W's Business Development Department. *Id.* S&W thus argues that it did not disregard Seetharaman's proposals since it passed his suggestions on to Tom Brady in Business Development. ALJX 35 at 24; TR 2381-82.

      Although I have determined that Seetharaman's ERA complaint was timely filed with respect to this allegation, I conclude on the merits that the allegation does not present a legally cognizable adverse employment action. The ERA prohibits employers from discriminating against any employee "with respect to his compensation, terms, conditions, or privileges of employment" because the employee engaged in protected whistle-blowing activity. 42 U.S.C. § 5851(a). Thus, an employee must show that he suffered an adverse employment action as a result of his whistle-blowing activity. *Hasan v. U.S. Dept. of Labor*, 298 F.3d 914, 916 (10th Cir.2002). A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761-762 (1998).[11] To prevail on this claim, Seetharaman must

---

[11] Compare *Crady v. Liberty Nat. Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993) ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation"), *with Flaherty v. Gas Research Institute*, 31 F.3d 451, 456 (7th Cir. 1994) (a "bruised ego" is not enough), *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 887 (6th Cir. 1996) (demotion without change in pay, benefits, duties, or prestige insufficient), and *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994) (reassignment to more inconvenient job insufficient).

prove that he suffered adverse consequences from S&W's failure to pursue the business opportunities with which he presented it. *See Montandon v. Farmland Indus., Inc.,* 116 F.3d 355, 359 (8th Cir.1997) ("[T]he action must have had some adverse impact on [the complainant] to constitute an adverse employment action."). He cannot simply rely on his mere assertion that this diminished his potential for growth within the company, especially when S&W presented evidence that business development was not part of his job, because "not everything that makes an employee unhappy is an actionable adverse action." *Greaser v. Missouri Dep't of Corrections,* 145 F.3d 979, 984 (8th Cir.1998), quoting *Montandon,* 116 F.3d at 359. Seetharaman has presented no evidence to establish that S&W's alleged indifference toward his business leads limited his growth potential in the company and / or was done as a result of his whistle-blowing activities. If anything, the record reflects that Seetharaman's supervisor encouraged him to present the business proposals to S7W's Business Development Department. For these reasons, I conclude that S&W's alleged failure to pursue the business opportunities identified by Seetharaman does not constitute an adverse employment action and, therefore, cannot form the basis of a finding that S&W discriminated against him in violation of the ERA.

        D. The Merits of Seetharaman's Termination Claim

            1. <u>Analytical Framework under the Employee Protection Provisions</u>

        The Environmental Acts and the ERA contain employee protection provisions that prohibit covered employers from discharging or discriminating against employees for reporting environmental violations or instituting proceedings resulting from the administration or enforcement of the statutes.[12] Complaints of discrimination in violation of the employee

---

[12] The CAA, 42 U.S.C. § 7622(a) and the TSCA, 15 U.S.C. § 2622 (a), provide, in pertinent part,

> No employer may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions or privileges of employment because the employee . . .
>
> (1) commenced, caused to be commenced, or is about to commence or cause to be commenced a proceeding under this chapter or a proceeding for the administration or enforcement of any requirement imposed under this chapter or under any applicable implementation plan,
>
> (2) testified or is about to testify in any such proceeding, or
>
> (3) assisted or participated or is about to assist or participate in any manner in such a proceeding or in any other action to carry out the purposes of this chapter.

The SWDA, 42 U.S.C. § 6971(a), provides,

> No person shall fire or in any other way discriminate against, or cause to be fired or discriminated against, any employee or any authorized representative of employees by reason of the fact that such employee or representative has filed, instituted, or caused to be filed or instituted any proceeding under this chapter or under any applicable implementation plan, or has testified or is about to testify in any proceeding resulting from the administration or enforcement of the provisions of this chapter or any applicable implementation plan.

The FWPCA, 33 U.S.C. § 1367(a), provides,

> No person shall fire, or in any other way discriminate against, or cause to be fired or discriminated against, any employee or any authorized representative of employees by reason of the fact that such employee or representative has filed, instituted, or caused to be filed or instituted any

protection provisions are analyzed under a scheme of shifting burdens of persuasion and production. Initially, a complainant must present a *prima facie* case by presenting "evidence sufficient to raise an inference, a rebuttable presumption, of discrimination." *Schlagel v. Dow Corning Corp.*, 2004 WL 1004875, ARB No. 02-092, ALJ No. 2001-CER-1, slip op. at 13 n.1 (ARB Apr. 30, 2004) (*Schlagel*). At this stage of the litigation, a preponderance of the evidence is not required. In order to meet the *prima facie* burden, a complainant need only show "that that the employer is subject to the applicable whistleblower statutes, that the complainant engaged in protected activity under the statute of which the employer was aware, that the complainant suffered adverse employment action and that a nexus existed between the protected activity and the adverse action." *Id.* In denying S&W's motion for a judgment in its favor was denied at the conclusion of Seetharaman's direct case, I found that Seetharaman had made out a *prima facie* case of discrimination. TR 1125-26.[13] Thus, S&W was required to put on evidence supporting its defense that the decision to terminate Seetharaman's employment was based on legitimate

---

proceeding under this chapter, or has testified or is about to testify in any proceeding resulting from the administration or enforcement of the provisions of this chapter.

The CERCLA, 42 U.S.C. § 9610(a), provides,

No person shall fire or in any other way discriminate against, or cause to be fired or discriminated against, any employee or any authorized representative of employees by reason of the fact that such employee or representative has provided information to a State or to the Federal Government, filed, instituted, or caused to be filed or instituted any proceeding under this chapter, or has testified or is about to testify in any proceeding resulting from the administration or enforcement of the provisions of this chapter.

The ERA, 42 U.S.C. § 5851(a), provides,

No employer may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment because the employee . . .

(A) notified his employer of an alleged violation of this chapter or the Atomic Energy Act of 1954 (42 U.S.C. 2011 et seq.);
(B) refused to engage in any practice made unlawful by this chapter or the Atomic Energy Act of 1954, if the employee has identified the alleged illegality to the employer;
(C) testified before Congress or at any Federal or State proceeding regarding any provision (or proposed provision) of this chapter or the Atomic Energy Act of 1954;
(D) commenced, caused to be commenced, or is about to commence or cause to be commenced a proceeding under this chapter or the Atomic Energy Act of 1954, as amended, or a proceeding for the administration or enforcement of any requirement imposed under this chapter or the Atomic Energy Act of 1954, as amended;
(E) testified or is about to testify in any such proceeding or;
(F) assisted or participated or is about to assist or participate in any manner in such a proceeding or in any other manner in such a proceeding or in any other action to carry out the purposes of this chapter or the Atomic Energy Act of 1954, as amended.

---

[13] Specifically, I found that Seetharman raised a reasonable inference that he engaged in activities protected under the statutes on which he based his claim; that his supervisors were aware of the protected activity; and that there was a nexus between his termination and his protected activity. *Overall v. Tennessee Valley Auth.*, ARB No. 98-111, ALJ No. 1997-ERA-53, slip. Op. at 15-22 (ARB Apr. 30, 2001). I found that it was reasonable to infer that his protected activities included alerting supervisors to his concern (1) over S&W's plan to use ammonia gas a working fluid in the nuclear reactor loop; (2) that the design of the aux boiler system on the Covert Project has the potential for release of toxic particulate matter; and (3) that his recommendations on pipe sizing, though necessary to avoid accidental plant failure, were not being employed by the HB Group. TR 1127.

business considerations. Since the case has been fully tried on the merits, the issue to be adjudicated is no longer whether Seetharaman has met his *prima facie* burden but whether he has proved by a preponderance of the evidence that S&W terminated his employment because of protected activity. *See Williams v. Baltimore City Pub. Schools Sys.*, 2003 WL 21269141, ARB No. 01-021, ALJ No. 00-CAA-15, slip op. at 3 n. 7 (ARB May 30, 2003); *Jenkins v. United States Environmental Protection Agency*, 2003 WL 724100 ARB No. 98-146, ALJ No. 1988-SWD-2, slip op. at 16-17 (ARB Feb. 28, 2003). Resolution of this issue involves a two step inquiry. First, it must be determined whether S&W has carried its burden of producing evidence or articulating that it took the adverse employment action for "a legitimate, nondiscriminatory reason (a burden of production, as opposed to a burden of proof)." *Schlagel*, slip op at 13 n.1. If S&W meets this production burden, Seetharaman bears the ultimate burden of persuasion and thus must prove that S&W's proffered "legitimate" reason is mere pretext rather than the true reason for the challenged employment action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 256 (1981). In other words, "the rebuttable presumption created by the complainant's *prima facie* showing 'drops from the case' [and] the inference of discrimination disappears, leaving the complainant to prove intentional discrimination by a preponderance of the evidence." *Id.* (citations omitted; internal quotation marks in original).

## 2. Evidence of Legitimate Reasons for Terminating Seetharaman

S&W asserts that senior company management ordered a company-wide, ten-percent reduction in force (RIF) in or around late April, 2002 in response to a substantial decrease in its business and the absence of prospects for future business sufficient to sustain existing staffing levels. S&W further asserts that the RIF required Joseph Green, the Chief Mechanical Engineer, to layoff one engineer from the HB Group, and it alleges that Seetharaman was chosen for the layoff because he was the lowest performing engineer in the group and because there was no other job to which he could be transferred. TR 1739; ALJX 33 at 35.

### a. Evidence of the Decline in Business

S&W introduced a significant amount of evidence in support of its allegation that a decline in business in 2002 prompted a company-wide RIF. Dirk J. Wild, Chief Accounting Officer with The Shaw Group, S&W's parent company, testified regarding The Shaw Group's financial situation during the time period leading up to the RIF.[14] He said that that S&W's business is analyzed as part of The Shaw Group's Engineering, Construction and Maintenance (ECM) Division. TR 2636; 2641-42. Wild explained that business analysis and planning considers "backlog" which is a variable figure representing future projects, generally assessed by way of a signed contract between the company and its customers. TR 2649. More specifically, a decrease in the ECM Division's backlog indicates a need to reduce the Division's resources. TR 2651. Wild testified that during the three-month period from November 30, 2001 to February 28, 2002, the ECM Division's power generation backlog decreased from $3.629 billion

---

[14] S&W is a wholly owned subsidiary of The Shaw Group. TR 1158.

$3.424 billion, a loss of $206 million or 5.7 percent. TR 2664.[15] Wild said that this decrease in the backlog of power generation business indicated that S&W's future sales and work in the power generation market would decline. TR 2665. He explained that the decrease was significant because The Shaw Group had experienced an increase in backlog every other quarter since 2000. *Id.* Wild testified that the power generation backlog further decreased by $511.5 million or 14.9 percent during the three month period ending on May 31, 2002. TR 2679. Thus, the ECM Division's power generation backlog over the course of the six month period from November 1, 2001 to May 31, 2002 decreased by $717 million or by nearly 20 percent. TR 2680. According to Wild, "That's losing one-fifth of your future work that you are projecting over a six-month time period. That was very significant." *Id.* Furthermore, Wild testified that by August 31, 2002, power generation backlog decreased by another $356 million or an additional 9.6 percent. TR 2688.

Wild explained that the power generation backlog includes backlog from three separate power industries within S&W namely, (1) nuclear power; (2) fossil fuel; and (3) other power. TR 2688. Wild also testified that the nuclear power segment of the power generation backlog increased from $437 million in August, 2001 to $1.156 million in November, 2002. TR 2705. However, Wild further explained that over 80 to 90 percent of the nuclear backlog was attributable to maintenance work on nuclear power plants which included little, if any, engineering work. TR 2690. Finally, Wild testified that from the end of May, 2002 – the month in which Seetharaman was terminated – to the end of February, 2003, the total power generation backlog continued to decrease by an additional $1.134 billion. TR 2713. Wild concluded that this decrease of over $1 billion dollars in nine months was "almost a 40 percent decline in the Power Generation, which is obviously a very, very significant decline." *Id.*

Charles Cronan, S&W's Director of Engineering, testified that beginning in late 2000 and continuing through 2001, the power generation industry as a whole, and S&W's power generation business in particular, was growing. TR 1158-62. Cronan stated that as a result of this growth, S&W hired approximately 500 additional engineers, including Seetharaman, throughout 2001. TR 1163, 1174. However, Cronan further testified that in 2002, work in the power generation industry, both globally and at S&W in particular, slowed as a result of a lagging economy, lower demand for electricity, and the high cost of power. TR 1187, 1190. Cronan stated that in 2002, S&W experienced cancellation or postponement of a number of fossil fuel engineering projects for which it had anticipated work, thus altering its forecast for manpower and resource needs. TR 1192-93. According to Cronan, this decrease in power generation backlog indicated that S&W would face lower revenues and a reduced demand for labor in the near future, thus necessitating a layoff of a number of employees. TR 1194. More specifically, Cronan testified that while S&W's fossil fuel power generation backlog was approximately 2.2 billion dollars at the end of August, 2001, it decreased to less than one billion dollars at the end of August, 2002 and 250 million dollars as of August, 2003. TR 1194-95.[16]

---

[15] Cronan testified that S&W is the only company in The Shaw Group involved in the power generation industry. TR 1294.

[16] Although Cronan acknowledged that within the power generation industry there was a growth in nuclear backlog, he attributed that growth to contracts for nuclear power plant maintenance that required neither work from the Heat Balance Group nor engineering work in general. TR 1297-98, 1327.

b. Reasons for including Seetharaman in the RIF

Joseph Green, S&W's Chief Mechanical Engineer, testified that in May, 2002, workflow at S&W was declining, and they were running out of work for engineers in the HB Group, where Seetharaman worked at the time. TR 2421. At that time, Green's supervisor, Charles Cronan, directed him to reduce the Mechanical Division, which was then comprised of approximately 230 engineers, by ten percent. TR 2419. Thus, it was Green's responsibility to choose twenty-three people for termination, one of whom was Seetharaman. TR 2422. Green testified that he based his decisions on which employees to include in the RIF on feedback he received from supervisors and the following considerations: the employee's (1) value to the division and the company; (2) level of experience; (3) position; (4) status a specialist needed for the long-term health of the company; and (5) status as a contract or full-time employee. TR 2423. Green testified that some of the 23 employees he selected for the lay-off were contract employees since he preferred to layoff contract employees because they had been hired for short-term positions. TR 2428. He also testified that several of the twenty-three employees included in the RIF were from the Chicago office that closed at that time and that several others were from the Ravenswood project in New York that no longer had work for engineers. TR 2428-29.

Green testified that he based his decision to include Seetharaman in the layoff on the low workload in the HB Group, the fact that there was no job to which Seetharaman could be transferred, and the feedback that he received from Seetharaman's supervisors, Edwards and Zervos. TR 2429. Green stated that he "just didn't see long term potential for Mr. Seetharaman with the company." *Id.* He said that when Seetharaman worked on the Covert project, Edwards informed him that Seetharaman just wasn't getting the job done. TR 2399. He also noted that Zervos had reported that Seetharaman was slow to complete projects and didn't always meet deadlines during the time that he was assigned to the HB Group. TR 2415. Green added that Zervos gave him "some performance feedback that other engineers with less experience were getting things done in a quicker and more efficient manner." TR 2415. He testified that shortly after Seetharaman was terminated, a second HB Group engineer, Jay Tong, was let go, and another engineer, Ignacio Garcia, was reassigned out of the HB group. TR 2429. Finally, Green testified that since the RIF in May, 2002, S&W hired only one employee in the Stoughton office: Sal Lombardi, a former engineer who was laid off from an engineering position was rehired in April, 2003 into a design position. 2436-37.

David Edwards, Seetharaman's direct supervisor on the Covert project, issued a positive performance evaluation of Seetharaman's work in September, 2001. TR 1350, 1352. Edwards testified, however, that he gave Seetharaman "the benefit of the doubt" in this evaluation since he had just started working with Seetharaman three months earlier and didn't want to impact Seetharaman's career before getting to know him better. TR 1356. Despite his generally favorable performance evaluation, Edwards testified, "It was becoming apparent to me, and it had been pointed out by at least one or two other individuals, that maybe he [Seetharaman] wasn't performing up to par and that I was giving him a lot of latitude." TR 1353. Edwards stated that when compared with the three other engineers on the Covert project, Seetharaman was the least productive and least valuable to the project. TR 1358. Edwards also testified that Seetharaman's performance worsened after the evaluation was issued:

I was getting extremely agitated with his [Seetharaman's] lack of being able to either come to a conclusion on the gas turbine cooling design or to come to a

- 16 -

conclusion on getting a conformed specification for the auxiliary boiler . . . I really got to a high state of agitation probably in November [2001].

TR 1359. Edwards related that it seemed as though each time he went to Seetharaman's office to speak with him, Seetharaman was either on the internet doing non-work activity or just not accomplishing his goals. *Id.* Edwards explained that these observations prompted him to tell Green that he did not want to work with Seetharaman in the future. TR 1362. Around this time, Green indicated to Edwards that he had an assignment for Seetharaman on the HB Group. TR 1363, 2400.

Nick Zervos, who was Seetharaman's direct supervisor in the HB Group, testified that it took Seetharaman ten days to perform calculations that a less experienced employee completed in just three days. TR 1713-14. In addition, Zervos stated that when he asked Seetharaman to create a diagram from a computer program and gave Seetharaman a sample diagram to use as a model, Seetharaman prepared a diagram that was a "horrible jumble of, of, you know, components and lines, crisscrossing all different ways . . . It was totally incomprehensible and unprofessional . . . I was shocked." TR 1716. Zervos testified that he had to instruct Seetharaman to rework the diagram in order for it to be understandable and professional. TR 2007.

Zervos testified that in the spring of 2002, when he learned that S&W would be undergoing a companywide 10 percent reduction in force he was not surprised because although the HB Group was still fairly busy, the workload was starting to decline. TR 1737. Zervos stated that Green informed him that as part of the RIF, one person from the HB Group had to be laid off, and Green suggested that Seetharaman be the one. *Id.* Zervos testified that he agreed that Seetharaman should be part of the RIF because of Seetharaman's lack of productivity, and because "it seemed like he [Seetharaman] was looking for problems as opposed to looking for solutions, and … it didn't seem like he was getting any results." *Id.*

Zervos testified that another factor weighing in favor of Seetharaman being included in the RIF was that Seetharaman spent a lot of time on projects unrelated to his work assignments in the HB Group. TR 1378. Zervos testified that Seetharaman arranged meetings and took time out of the office to pursue a business development project on a wind farm in Cape Cod, even though wind farms have nothing to do with heat balance or thermal engineering work. *Id.* Zervos stated that this made him question Seetharaman's judgment. TR 1739. Zervos stated that Seetharaman was the least productive member of the HB Group at the time the RIF was being contemplated. *Id.* Finally, Zervos added that a few months after Seetharaman was laid off, Jay Tong, another member of the HB Group, was laid off due to lack of available work.[17] *Id.*

William Card, an Engineering Specialist at S&W, also testified regarding Seetharaman's work in the HB Group.[18] TR 2020. Card directed Seetharaman's activities

---

[17] Zervos testified that Tong was re-hired about a year and one half after he was laid off to work on a specific project and that he was once again a full-time employee at S&W. TR 1743. At the time of Zervos' testimony, Zervos stated that Tong was a full-time employee at S&W. *Id.*

[18] Card worked in the Heat Balance Group from 1987 until 1993, was laid off as part of a reduction in force from 1993 through 1996, and returned to the HB Group in 1996, where he has worked since. TR 2021.

and was responsible for reviewing Seetharaman's work within the HB Group. TR 2071, 2084. Card said that when Seetharaman joined the HB Group in early 2002, the group was comprised of approximately six other engineers: Card, Zervos, Ram Srinivasan, Keith Paul, Ignacio Garcia and Jay Tong. TR 2042.[19] Card testified that Seetharaman completed his work in the HB Group "extremely slowly." TR 2082. More specifically, Card testified that Seetharaman made very slow progress when he was assigned to make calculations pertaining to water heater drains. TR 2082. Card also offered the following assessment of the quality of Seetharaman's work:

> There were a large number of minor mistakes of various sorts. Especially, as I recall, in computing the loss coefficients of enlargers and reducers, which are part of the piping fitting. And there is [sic] a lot of things that were not properly accounted or fittings that were in the wrong section or in the wrong number. So there were a lot of errors.

TR 2089. Card stated that Seetharaman's calculations required re-working and that Card "found it extremely difficult to keep Ram [Seetharaman] focused" on his work. TR 2095. Card also said that Seetharaman completed tasks at a much slower pace in comparison to his co-workers. TR 2096. He testified that on one occasion, when he was concerned with the amount of time it was taking Seetharaman to complete a project, he went to Seetharaman's office but was unable to locate him there. TR 2096. Not finding Seetharaman, Card said that he searched Seetharaman's computer to locate the files on the projects which lead to the following discovery:

> [H]e [Seetharaman] had done no work at all on the files that I had sent him a couple of days previously. I had not [sic] idea what to do at that point. I mean, this guy was supposed to be working on my work, but he wasn't working on it. I also looked around his cubicle that day and found in his out basket some printouts from the internet with the same date – I think it was 4/13, 3/14, March; something like that – investment advice – which suggested to me that he had in fact been in the office someplace, just not at his desk and not doing the work that he was supposed to be doing for me, which I found extremely frustrating.

TR 2097. Card stated that the project that he gave to Seetharaman would have taken Seetharaman's co-workers a matter of hours to finish, yet it had not been completed by Seetharaman in approximately two days. TR 2096. When asked to compare Seetharaman's work with that of Jay Tong, who started in the HB Group around the same time as Seetharaman, Card testified that "Mr. Tong had been making much better progress" and more quickly familiarized himself with the calculation process. TR 2098. Card said that in addition to reporting Seetharaman's slow progress to Zervos, he told Zervos that Iganacio Garcia and Jay Tong were doing well. TR 2099.

As detailed above, S&W has introduced substantial evidence that it terminated Seetharaman's employment for legitimate, non-discriminatory reasons. Since S&W's burden is only one of production, its introduction of evidence "whatever its persuasive effect" is enough to rebut the presumption of unlawful discrimination raised by Seetharaman's *prima facie* case and

---

[19] Card was not sure whether Garcia was assigned to the HB Group when Seetharaman first arrived, and he testified that Tong and Seetharaman both joined the group at the same time. TR 2042, 2070.

shift the adjudicatory focus to the ultimate question of whether Seetharaman has proved by a preponderance of the evidence that S&W intentionally discriminated against him because of his protected activity. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993); *Masek v. The Cadle Co.*, 2000 WL 562699, ARB No.97-069, ALJ No. 1995-WPC-1, slip op. at 10-11 (ARB Apr. 25, 2000).

### 3. Has Seetharaman proved intentional discrimination?

Seetharaman attempts to meet his burden of proving intentional discrimination with direct evidence of retaliatory motivation. He also argues that circumstantial evidence reveals that S&W's articulated legitimate business reasons for his layoff are pretextual which permits an inference of intentional discrimination. After a careful consideration of the totality of evidence, including an assessment of the credibility of witnesses, I conclude that the Claimant has not met his burden.

#### a. Credibility

There are several conflicts between Seetharaman's account of pertinent events and the testimony elicited from S&W's witnesses. The most significant of these conflicts involves Seetharaman's claim that Zervos responded to his concerns over S&W's methodology for calculating safe drain pipe sizes for the Lungmen nuclear plant by warning him that "we cut out people who don't follow our ways." TR 581-82. If this statement were made it would potentially constitute the type of powerful "smoking gun" evidence of unlawful retaliatory motivation that is rarely seen in discrimination litigation. Since Zervos denied making any such statement to Seetharaman, TR 2012, witness credibility is a critical issue.

Seetharaman was on the witness stand for four days, thus providing an excellent opportunity for observing his demeanor and examining his testimony for any inconsistencies. While I have no doubt that Seetharaman sincerely believes that S&W discriminated against him, I find that his much of his testimony is problematic for several reasons and that it cannot be credited as trustworthy. During both direct and cross-examination, Seetharaman had tremendous difficulty providing straight-forward, factual responses to questions. Under cross-examination by S&W's attorneys, he was argumentative and combative which necessitated repeated instructions from the bench that he listen to questions and provide direct answers rather than arguments or speeches. Nevertheless, his testimony frequently amounted to a highly confusing amalgam of fact and his subjective interpretation of events and statements, rather than a simple recitation of what was said or done, by whom and when. In addition, Seetharaman displayed a disturbing tendency to sensationalize and exaggerate the facts in an apparent effort to win the court over to his view that S&W is a rogue engineering firm that compromises environmental health and safety by cutting corners and stifling any dissent under threat of adverse employment action.

Seetharaman's testimony regarding the type of water used on the Covert Project demonstrates his tendency to provide confusing, imprecise and exaggerated testimony. Seetharaman testified that when he worked on the Covert Project, he repeatedly raised safety concerns with S&W regarding its plan to "spray" "raw lake water" on the gas turbine. TR 59-64, 71-72. Specifically, Seetharaman charged that S&W planned to "take just the water from the lake that's dirty and they were thinking of just spraying it in front of the gas turbine air." TR 60. He also claimed that S&W planned to use untreated, undrinkable water, taken straight from the

lake with "muck, dirt, all kinds of stuff in it." TR 62-63. This characterization was not just imprecise; it clearly amounted to an exaggeration so blatant that Seetharaman's own attorney, an honorable advocate, was compelled to take the extraordinary measure of cross-examining his client in order to set the record straight:

Q:     Mr. Seetharaman, you referred to muck water.

A:     Yes. Raw water.

Q:     Raw water. Okay. I saw in some of the correspondence that it was described or the process that was described as using filtered water.

A:     Yes, yes. Why it came out of my mouth is because sometimes I use the word dirty water, muck water or sediment water. So if gave you the wrong sense –

Q:     Okay. So this would be filtered but not demineralized water.

A:     Right. I'm talking about raw water now.

Q:     Raw water.

A:     Right.

Q:     That is taken from the lake –

A:     Right.

Q.     -- run through a filter and put – run through the filter I would think to remove muck and sediment and things like that?

A.     Yes, yes.

Q.     And other contaminants, to whatever extent the filter can do that effectively, but it's not demineralized.

A.     Yes.

TR 115-116. As Seetharaman was forced to reluctantly admit, S&W never planned to spray "raw" lake water, full of "muck" and other contaminants, on the Covert Plant turbine. Instead, S&W's plan involved the use of an evaporative cooling process in which filtered lake water was strained or dripped through a screen, not "sprayed" onto the turbine. TR 1397-98 (Edwards); 1707 (Zervos). Seetharaman similarly misrepresented his own recommendations regarding the use of de-mineralized water. In this regard, he testified that on April 10, 2001, he notified Don Yonika and Edwards by memoranda and an attached research study that only de-mineralized water should be used in order to maximize public and environmental safety. TR 68. The actual memoranda and attached report undercut this testimony, however, since neither state that de-mineralized water is required or would better protect the environment. CX 1.[20] In my view, gross inaccuracies of this magnitude from a highly trained engineer cannot be attributed to an

_____

[20] In fact, the attached report recognizes the potential use of water that was not de-mineralized. CX 1 at 3-8.

- 20 -

innocent lack of precision. Rather, I find that they represent a clumsy, and ultimately unconvincing effort to manipulate the facts into a picture in which S&W appears as the environmental villain and Seetharaman as the courageous and principled defender of the public interest.

The foregoing concerns with Seetharaman's reliability as a witness would be enough to discredit his testimony that Zervos responded to his safety concerns on the Lungmen project with a thinly veiled threat that S&W "cuts out" employees who fail to toe the company line. But, there is an additional reason. The record in this case contains copies of close to 100 "e-mail" messages as well as other correspondence that Seetharaman meticulously created and preserved to document his dealings with S&W management. Indeed, when Seetharaman felt that he was being unfairly pressured to move from the Covert project to the HB Group and to cancel his planned vacation in order to complete his Covert assignments, he showed no hesitancy to set his feelings down in writing. CX 102. Yet, the first reference to Zervos' alleged threat does not appear until June 3, 2002, when Seetharaman filed his complaint with OSHA. This void is inconsistent with Seetharaman's usual practice, and I find that it is highly improbable that he would not immediately respond in some way to a perceived threat of retaliatory termination.

For these reasons, I have given little weight to Seetharaman's testimony, and I specifically find that credible evidence does not establish that Zervos threatened Seetharaman with termination in response to the latter's raising nuclear safety concerns with respect to the calculation of drain pipe sizes in the Lungmen plant. I also find that Zervos testified consistently and was a more credible witness than Seetharaman. Accordingly, I credit his denial that he ever told Seetharaman that S&W cuts out employees who don't follow company ways. I similarly find that Card was a highly cooperative and precise witness, and I fully credit his testimony regarding Seetharaman's performance deficiencies as well as his explanation of his use of the term "finagle". Indeed, based on my observations of Card's demeanor which showed him to be a highly intelligent and conscientious engineer, I find that it is entirely incredible that he would, as Seetharaman would have the court find, risk his professional reputation and expose himself and S&W to potential civil, if not criminal, liability by participating in a scheme to fraudulently calculate the size of a nuclear power plant's drain pipes.

b. Pretext

In an effort to expose S&W's articulated non-discriminatory reasons for his layoff as a pretext for intentional whistleblower discrimination, Seetharaman argues that press releases issued by S&W's parent company, The Shaw Group, show that S&W's business "was booming" in May, 2002 when Seetharaman was terminated. ALJX 32 at 31. In support of this argument, he introduced Shaw Group press releases which state (1) that The Shaw Group had an increase in backlog as of April 15, 2002; and (2) that during the nine months ending on May 31, 2002, The Shaw Group's earnings increased 67 percent to $1.9 billion, when compared to $1.2 billion in sales for the nine months ending on May 31, 2001. CX 28, 269, 283-287. Seetharaman argues that since S&W makes up 91 percent of The Shaw Group, this reported increase in earnings and backlog must be indicative of an economically stable S&W. He further argues that while Shaw's power generation backlog may have decreased between 2001 and 2003, that fact that the backlog in nuclear projects actually increased from 437 million to 1.189 billion between August 31, 2001 and August 31, 2002 shows that he was included in the RIF for illegitimate

- 21 -

discriminatory reasons since most, if not all, of his work in the HB Group was on nuclear projects. TR 522, 1783, 2026; ALJX 34 at 18, RX 21. In essence, Seetharaman contends that S&W unnecessarily laid off ninety engineers in its Stoughton office in May 2002, including 23 employees from the Mechanical Engineering Department where he worked, to cover up its discriminatory decision to terminate his employment. Moreover, even assuming that Seetharaman could establish that the May 2002 reduction-in-force was not economically necessary, "it is not enough . . . to show that a reason given for a job action is not just, or fair, or sensible . . . [rather] he must show that the explanation is a 'phony reason.'" *Gale v. Ocean Imaging*, ARB No. 98 143, ALJ No. 1997 ERA 38, slip op. at 8 (ARB July 31, 2002), quoting *Kahn v. U.S. Secretary of Labor*, 64 F.3d 271, 277 (7th Cir. 1995). *See also Pignato v. Am. Trans Air*, Inc., 14 F.3d 342, 349 (7th Cir. 1994). In a case such as this where an employer has laid off not only a putative whistleblower but a large number of employees, ostensibly based on for economic reasons, this is a difficult burden which Seetharaman has clearly failed to meet. *Jones v. U.S.D.O.L., Administrative Review Board*, 2005 WL 2173767, *7(6th Cir. 2005) (Claimants alleging improper discharge in the context of a RIF may face a heightened burden of proof because the RIF itself is evidence of a legitimate reason for discharge), citing *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1464-65 (6th Cir. 1990) (Title VII case). *See also Groves v. Cost Planning and Management International, Inc.*, 372 F.3d 1008, 1010 (8th Cir. 2004) (in addition to establishing pretext, plaintiff challenging reduction in force must show their protected status was a factor in the termination).

Upon review of the entire record, I find that Seetharaman's evidence of the overall economic health of The Shaw Group during 2002 is insufficient to rebut the specific, credible and uncontradicted testimony from S&W witnesses Cronan and Wild that the reduction in power generation backlog reduced S&W's need for engineers and that the contemporaneous increase in nuclear backlog is attributable to a increase in nuclear plant maintenance contracts which do not require the expertise of the HB Group or engineering services in general. TR 1297-98, 1327, TR 2690, 2705. Seetharaman tries to counter this evidence by making a vague and unsupported assertion that mechanical engineers, including himself and Bill Card, have historically performed maintenance work at nuclear power plants. ALJX 34 at 19. As he cites no evidence in the record that either he or Card did maintenance work at nuclear plants, I give no credence to this claim. As a result, I must find that the increase in nuclear maintenance backlog has little, if any relevance in consideration of whether Seetharaman was terminated for discriminatory reasons. That Seetharaman has not shown S&W's proffered reasons for the RIF to be pretextual is underscored by the uncontradicted evidence that (1) the HB Group suffered a decline in work in the spring of 2002; and (2) shortly after Seetharaman was terminated, a second HB Group engineer, Jay Tong, was let go, and another engineer, Ignacio Garcia, was reassigned out of the HB group due to the lack of available work. TR 2429.

Seetharaman alternatively argues that S&W's decision to lay him off rather than transfer him to another department within The Shaw Group shows that he was terminated in retaliation for his protected activities. ALJX 32 at 31. In support of this theory, he relies on RX 6, a chart of S&W's layoffs and transfers of employees, to reveal that between mid-2002 and early 2003, S&W transferred more than 520 employees to Shaw E&I, Shaw's Environmental and

Infrastructure Division. *Id.;* RX 6.[21]  I find that this argument fails since Seetharaman has presented no evidence that he was qualified for any position in Shaw E&I, or that Shaw E&I needed mechanical engineer(s) around the time he was laid off. *Tracanna v. Arctic Slope Inspection Service*, ARB No. 98-168, ALJ No. 1997-WPC-1, slip op. at 12 (ARB July 31, 2001).

Seetharaman additionally contends that Zervos' testimony about his job performance reveals that retaliation for protected activity motivated his discharge.  In this regard, Zervos testified that one of the reasons Seetharaman was included in the RIF was because Seetharaman "was always quibbling about things . . . it seemed like he was looking for problems as opposed to looking for solutions . . . and it didn't seems like he was getting any results . . . He was just looking for things to go wrong."  TR 1737-38.  Seetharaman argues that this testimony proves that he was included in the RIF because he engaged in protected activities by pointing out problems with S&W's methodologies and by suggesting that S&W use the G.S. Liao method for calculating drain pipe sizes.  Upon careful review of the record, however, I find that Zervos' comments were made in the context of his description of Seetharaman's work-product and not in response to any of Seetharaman's protected activities.  Viewed in their proper context, Zervos' comments underscored his impression that Seetharaman was not a productive employee in the HB Group because he spent an inordinate amount of time on activities unrelated to his work assignments and because he had difficulty utilizing programs and methodologies that Zervos believed to be the most appropriate for completing his heat balance engineering assignments. Accordingly, I find that Zervos' comments regarding Seetharaman's tendency to look for problems were not made in response to Seetharaman's protected activities.  As discussed above, the credible evidence establishes that Zervos encouraged Seetharaman to provide him with a copy of G.S. Liao's paper which he reviewed and found not to be a satisfactory substitute for the TCPRFL program.  TR 1669-70.

Seetharaman also attempts to attack the *bona fides* of S&W's asserted legitimate reasons based on his attorney's protracted cross-examination of several witnesses on a range of engineering and scientific questions.  The apparent purpose of this strategy, which at time caused the proceedings to more closely resemble an engineering school classroom than an employment discrimination trial, was to cast doubt on S&W's expertise and reliability and thereby show that S&W employed flawed science which increased the risk of a catastrophic accident and environmental harm.  However, S&W's witnesses were able to answer questions persuasively, and Seetharaman called no expert witnesses and introduced no scientific literature to discredit their testimony.  The cross-examination also failed to develop inconsistencies and contradictions in the testimony of the S&W witnesses so as to render it inherently untrustworthy.  While this exercise demonstrated an impressive ability on the part of Seetharaman's attorney to parry with witnesses on a number of rather sophisticated engineering, mathematical and scientific matters, it fell well short establishing that S&W uses bad science which endangers public safety and the environment.

Lastly, Seetharaman disputes S&W's claims that he was unproductive, that his work was of poor quality and that he was the lowest performer in the Heat Balance Group.  He highlights the fact that on his only performance review he received a rating of 4 out of 5 on productivity

---

[21] RX 6 shows that the transfers to Shaw E & I began in or around August, 2002, three months after Seetharaman left S&W.

and quantity of work and was characterized as an "achiever." ALJX 34 at 21; CX 65. Seetharaman points out that his supervisors never voiced concerns regarding his productivity and never placed him on a performance improvement plan. ALJX 34 at 21. Seetharaman also asserts that it took him only four days to complete his first assignment, the Lungmen drain calculations, in the HB Group and that Zervos admitted that this assignment was done quickly. ALJX 32 at 33; TR 1856. Seetharaman also points out Zervos' testimony that his work on the Martin Project, another HB Group project, was satisfactory and without defects. ALJX 32 at 37; TR 2006-2010. Seetharaman attempts to strengthen this argument by claiming that Garcia, his co-worker in the HB Group, produced work of a lower quality than Seetharaman's on the Martin Project. *Id.*

Although Seetharaman received a satisfactory performance evaluation from Edwards, this evaluation was issued very early on in his employment at S&W and, significantly, several months before he was reassigned to the HB Group. Therefore, the performance appraisal does little to counter S&W's evidence that Seetharaman was the least productive member of the HB Group. Additionally, Seetharaman's claim that he completed the Lungmen calculations quickly is unpersuasive since Zervos testified that the calculations Seetharaman produced were incorrect and could not be used for the project. TR 1676-77. Similarly unpersuasive is Seetharaman's argument that his work on the ARROW computer program for the Martin Project was satisfactory. Although Zervos testified that one of Seetharaman's submissions on that project was "adequate," he also testified that Seetharaman's initial work using the ARROW program amounted to an unintelligible "hodgepodge of symbols and lines." TR 2008-2009. In addition, Seetharaman has not produced any evidence that he was more productive than Garcia, and even if he had produced such evidence, it would carry minimal weight in view of the fact that he was clearly not similarly situated to Garcia. That is, the record shows that Garcia was a junior engineer with an Associate's Degree in mechanical engineering, TR 2044, while Seetharaman is a mechanical engineer with a Master's Degree in Energy Engineering. TR 15-16. Moreover, Zervos testified that he gave Garcia's work to Seetharaman for him to use as a model after Seetharaman turned in an unacceptable mess. produced messy work, TR 2005. Accordingly, I conclude that Seetharaman has failed to introduce any credible evidence to rebut S&W's evidence that he was included in the RIF because he was the least productive member the HB Group.

## V. Conclusion

For the reasons discussed above, I make the following conclusions: (1) that the Seetharaman's allegations concerning S&W's failure to allow him to attend the May 18, 2001 seminar and his transfer to the Heat Balance Group are time-barred; (2) that the allegation of discriminatory failure to pursue business opportunities did not involve an adverse employment action cognizable under the ERA; and (3) that Seetharaman has not proved by a preponderance of the evidence that S&W intentionally discriminated against him in violation of the ERA or the Environmental Acts by terminating his employment. Accordingly, it is recommended that the complaint of Ramachandran Seetharaman against Stone & Webster, Inc. under the Clean Air Act, Comprehensive Environmental Recovery, Compensation and Liability Act, Federal Water

Pollution Control Act, Solid Waste Disposal Act, Toxic Substance Control Act, Energy Reorganization Act of 1974, and the implementing regulations be DISMISSED.

**SO ORDERED**.

<br>

**DANIEL F. SUTTON**
Administrative Law Judge

Boston, Massachusetts

## NOTICE OF APPEAL RIGHTS

To appeal, you must file a Petition for Review ("Petition") that is received by the Administrative Review Board ("Board") within ten (10) business days of the date of issuance of the administrative law judge's Recommended Decision and Order. The Board's address is: Administrative Review Board, U.S. Department of Labor, Room S-4309, 200 Constitution Avenue, NW, Washington, DC 20210. Once an appeal is filed, all inquiries and correspondence should be directed to the Board.

At the time you file your Petition with the Board, you must serve it on all parties to the case as well as the Chief Administrative Law Judge, U.S. Department of Labor, Office of Administrative Law Judges, 800 K Street, NW, Suite 400-North, Washington, DC 20001-8001. See 29 C.F.R. § 24.8(a). You must also serve copies of the Petition and briefs on the Assistant Secretary, Occupational Safety and Health Administration and the Associate Solicitor, Division of Fair Labor Standards, U.S. Department of Labor, Washington, DC 20210.

If no Petition is timely filed, the administrative law judge's recommended decision becomes the final order of the Secretary of Labor. See 29 C.F.R. § 24.7(d).

## SERVICE SHEET

Case Name:  **SEETHARAMAN RAMACHADRAN v. STONE & WEBSTER, INC. ET AL**

Case Number: **2003CAA00004**

Document Title: **RECOMMENDED DECISION AND ORDER**

I hereby certify that a copy of the above-referenced document was sent to the following this 30th day of November, 2005:


*Deneen Davis*
**DENEEN DAVIS**
LEGAL ASSISTANT

Directorate of Enforcement Programs
U. S. Department of Labor, OSHA
Room N-3603, FPB
200 Constitution Ave., N.W.
Washington, DC 20210
        *{Hard Copy - Regular Mail}*

Associate Solicitor
Division of Fair Labor Standards
U. S. Department of Labor
Room N-2716, FPB
200 Constitution Ave., N.W.
Washington, DC 20210
        *{Hard Copy - Regular Mail}*

Ramachadran Seetharaman
10 Pondview Drive
Ashland, MA 01721
        *{Hard Copy - Regular Mail}*

Walter Rhodes
Stone & Webster, Inc.
A Shaw Group Company
100 Technology Ctr. Drive
Stoughton, MA 02072-4705
        *{Hard Copy - Regular Mail}*

Kevin P. Sweeney, Esq.
Menard, Murphy & Walsh, LLP
60 State Street, 34th Floor
Boston, MA 02109
        *{Hard Copy - Regular Mail}*

Regional Administrator
U.S. Department of Labor/OSHA
1441 Main Street
Room 550
Springfield, MA 01103
        *{Hard Copy - Regular Mail}*

Martin H. Green, Esq.
Law Offices of Martin H. Green, P.C.
860 Worcester Road
Suite 200
Framingham, MA 01702-5260
        *{Hard Copy - Regular Mail}*

Administrative Review Board
U.S. Department of Labor
Room S-4309
200 Constitution Ave., N.W.
Washington, DC 20210
        *{Hard Copy - Regular Mail}*